## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ROSARIO GARCIA,

        Petitioner,

v.                                                      CIV No. 04-606 WJ/LFG

ERASMO BRAVO, Warden,
Guadalupe County Correctional
Facility,

        Respondent.

### MAGISTRATE JUDGE'S FINDINGS
### AND RECOMMENDED DISPOSITION[1]

### Findings

1.      This is a proceeding on a petition for writ of habeas corpus under 28 U.S.C. § 2254,

filed June 1, 2004.  [Doc. No. 1].  On July 8, 2004, Respondent filed an Answer [Doc. No. 7], in

which he requested dismissal of the § 2254 petition.  Petitioner Rosario Garcia[2] ("Mr. Garcia")

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2] Mr. Garcia graduated from high school and took some college classes.  [Transcript ("Tr.") of 1/23/04 hearing, at 85.]  Prior to incarceration, he worked as a tax preparer and had taken classes to obtain his CPA license.  Mr. Garcia was married to Tina Garcia when he was indicted.  Tina Garcia is the mother of Mr. Garcia's four children: Senaida, Angelita, Carlos and Dolores. [Doc. No. 1; Ex. H to habeas hearing.]

1

currently is confined at the Guadalupe County Correctional Facility in Santa Rosa, New Mexico.  Mr. Garcia is represented by counsel in this habeas proceeding.

2.      On September 7, 2000, Mr. Garcia pled guilty before the Second Judicial District Court of New Mexico (The Honorable Richard Knowles, J.) to three counts of attempted first degree criminal sexual penetration, three counts of second degree criminal sexual penetration, and eight counts of third degree criminal sexual contact of a minor.  [Doc. No. 7, Ex. B.]  On October 30, 2000, Mr. Garcia was sentenced before District Judge Frank H. Allen for an actual sentence of imprisonment of 50 years.  The Judgement, Partially Suspended Sentence and Commitment was entered on November 7, 2000 (State v. Garcia, No. CR 00-1328).  [Doc. No. 7, Ex. A.]

3.      As grounds for federal habeas review, Mr. Garcia asserts two claims:  (1) his guilty plea was neither voluntarily nor intelligently entered due to ineffective assistance of counsel by Attorney Ron Sanchez, who represented Mr. Garcia through the plea proceeding; and (2) Attorney Alex Chisholm, who represented Mr. Garcia after the plea and through his sentencing, provided ineffective assistance of counsel with respect to the motion to withdraw Mr. Garcia's guilty plea. [Doc. No. 1.]

4.      In his Answer, Respondent admits that Mr. Garcia has exhausted these claims and that the claims have been adjudicated on their merits in state court proceedings.  [Doc. No. 7, ¶¶ 3, 4.] Respondent generally denies all other allegations in Mr. Garcia's petition and asserts that the decisions on Mr. Garcia's claims by the state courts did not result in a decision that was contrary to, or that involved an unreasonable application of clearly established federal law.

5.      Both Mr. Garcia and Respondent attached a number of the underlying pleadings from the state court proceeding.  In addition, the Court ordered and reviewed the record proper of the

state court criminal proceedings in CR 00-1328, including the transcripts from the state habeas hearing, transcripts of other hearings, and the sealed exhibits to hearings.  Furthermore, the Court has examined whether it should hold an evidentiary hearing under 28 U.S.C. § 2254(e), and whether additional briefing from the parties would be of assistance.   After careful consideration of the underlying record proper, including the two-day hearing on the state habeas petition and previously submitted briefing on these same or similar issues, the Court determines that neither further briefing nor an evidentiary hearing are necessary in this matter.

## **Procedural History**

6.      On May 8, 2000, Mr. Garcia was indicted[3] by a grand jury of 16 counts related to alleged criminal sexual penetration of and criminal sexual contact with a minor.  The charges, spanning from 1986-1995, concerned alleged sexual contact with Dolores Garcia ("Dolores") (DOB 10/31/82), who is Mr. Garcia's daughter.   Dolores was 16 years old when the indictment was filed. [Record Proper ("RP") at 1-4.]  In 1998, Dolores first reported sexual abuse by her father.  At that time, she was 15 years old.  Dolores alleged that Mr. Garcia had been sexually abusing her since she was 4 to 6 years old.  [Doc. No. 1, Ex. J.]

### *Attorney Ron Sanchez and Proceedings Leading Up to Plea Agreement:*

7.      On February 25, 1999, upon the advice of Mr. Garcia's sister who is also an attorney, Mr. Garcia retained attorney Ron Sanchez to represent him.  Mr. Sanchez represented Mr. Garcia through the plea proceedings that took place on September 7, 2000.

---

[3]The original indictment was filed in CR 99-512 on February 11, 1999, but that indictment was dismissed without prejudice due to issues regarding the original Grand Jury presentation as raised in State v. Ulibarri, et al., 128 N.M. 686 (2000).  Mr. Garcia was subsequently re-indicted under criminal cause number 00-1328.  [RP at 7.]

8.    Between the time of the original indictment and June 22, 2000, three rule extensions were granted.  In addition, according to the State, its witnesses either had been interviewed or were made available to Mr. Garcia's attorney.  [RP at 15.]  A number of stipulated motions to compel were filed by the State in order to obtain various treatment records for both parties' review regarding Mr. Garcia's daughter.  [RP at 17, 20, 27, 142.]

9.    Judge Frank Allen was assigned to the criminal proceeding and set the case for a definite trial setting of September 11, 2000.  [RP at 19, 25.]  Both the State and Mr. Sanchez agreed at a short hearing held July 26, 2000 that the September 11, 2000 trial date was good for everyone. [Tr. of 7/26/00 hearing, at 2.]

10.    On August 31, 2000, Mr. Garcia filed a two-line motion to continue the trial setting stating that the discovery process was not complete and that he needed additional records in order to obtain an expert.  [RP at 52.]  The State opposed the continuance, arguing that the discovery process was virtually complete and that the State's witnesses were identified in two lists filed on March 15, 1999 and February 22, 2000.  The State made many of these witnesses available for interviews, and Mr. Sanchez interviewed virtually all of them.  As of August 31, 2000, only two State witnesses remained to be interviewed by Defendant: Dolores on September 4, 2000, and Jennifer Gomez Chavez on September 7, 2000.  [RP at 29.]

11.    The State explained that three of its witnesses were treating psychologists, whose records were made available to Mr. Sanchez on February 23, 2000, March 23, 2000, and July 11, 2000.  [RP at 30.]  Moreover, the State scheduled two of the psychologists for interviews by Mr. Sanchez on April 24, 2000 and August 17, 2000, but Mr. Sanchez did not show up for the interviews. The State notified Mr. Sanchez that the interviews would not be re-scheduled, and noted that Mr.

4

Sanchez did not object.  [RP at 30.]  The third psychologist's interview took place on August 21, 2000 but due to its length was not completed that day.  It was re-scheduled for August 24, 2000.  Mr. Sanchez canceled the continuation of that interview.  [RP at 31.]  Ultimately, however, Mr. Sanchez interviewed the majority of the treating therapists.  [Tr. of 1/22/04 hearing, at 26-28.]

12.     With respect to the request for continuing the trial setting, the State asserted that the Court should reject Mr. Garcia's argument that he needed additional records before being able to obtain an expert witness.  Mr. Sanchez had Dr. John Wilson's notes that referenced the existence of other records as early as March 23, 2000.  Other pertinent records were made available to Mr. Sanchez on June 22, 2000, which he picked up on July 17, 2000.  As of August 31, 2000, the only records Mr. Sanchez did not have were a few records from Dr. John Wilson that the State obtained on August 28, 2000 and faxed to Mr. Sanchez on August 29, 2000.  Those records reflected only medications prescribed to Dolores and her reactions to those medications.  [RP at 32.]

13.     According to the State, the first time that Mr. Sanchez asserted a need for an expert witness was during a pre-trial conference on August 28, 2000, two weeks before the trial setting.  [RP at 33.]

14.     On September 1, 2000, the state court held a hearing on Mr. Garcia's motion to continue the trial setting.  [Tr. of 9/1/00 hearing.]  At the hearing, Mr. Sanchez argued in part that his client faced up to 120 years in prison and had been requesting interviews since January 1999 but that the State had only scheduled the interviews within the prior three months.  [Tr. of 9/1/00 Hearing, at 2.]  Mr. Sanchez stated that his client was in need of an expert to address State witnesses' testimony that Dolores suffered from post-traumatic stress syndrome ("PTSD") as a result of the alleged abuse by her father.  Mr. Sanchez argued that he needed all of the records because Mr. Garcia

5

could not afford to have his expert look at the records piecemeal. The state court denied Mr. Garcia's motion for continuance but stated that Mr. Sanchez could have an expert sit through the trial before testifying on behalf of Mr. Garcia. The Court advised Mr. Sanchez that he knew for a long time that he needed an expert. Mr. Sanchez responded that he did not know he needed an expert and further stated: "It's going to create substantial prejudice to my client through ineffective assistance of counsel. It's going to cause him prejudice." [RP at 53; Tr. of 9/1/00 hearing at 14, 15.]

15.     Prior to the trial setting, Mr. Sanchez interviewed the following witnesses (some interviews had to be re-scheduled due to Mr. Sanchez's failure to show up): Sadie Serrano (Dolores' maternal grandmother and legal guardian), Detective Mike Marquez (lead detective in case), Andrea Serrano Garcia (Dolores' maternal aunt), Tina Garcia (Dolores' mother and Defendant's wife at the time) and Elizabeth Du passage (all on 3/23/00) (CYFD caseworker); Cynthia Aragon (7/17/00) (worked with Dr. Ornelas); Dr. Renee Ornelas (7/25/00) (UNM Physician who examined Dolores); Sandy Rodriguez (8/15/00) (the person to whom Dolores first disclosed her father had allegedly abused her); LaRisa Newell (8/21/00) (treating psychologist). [RP at 49]. Mr. Sanchez did not show up for the following interviews scheduled by the State: Miguel Acosta (another person Dolores to whom Dolores disclosed alleged abuse by her father), Mary Roy (treating psychologist), Elizabeth Du passage (continuation); Karen Wilbur (treating psychologist), and Henry Campos (of the Children, Youth and Families Department ("CYFD")). [Tr. at 50.]

16.     The parties attempted to negotiate a plea prior to the date of trial. Mr. Sanchez discussed with Mr. Garcia the possibility that he could be sentenced to a total of 162 years based on the indictment. [Tr. of 10/30/00 hearing, at 7.] In the middle of August 2000, the State offered its first plea which would have exposed Mr. Garcia to a sentence ranging from probation to a maximum

of 60 years of incarceration.  [Tr. of 10/27/00 hearing, at 10; Tr. of 10/30/00 hearing at 6-8; RP at 143.]  Mr. Garcia rejected that offer and stated that Mr. Sanchez told him then that he needed to get expert witnesses to review the case, which would requires six months for an adequate review of the case and preparation of Mr. Garcia's defense.  [Id.]

17.     On September 1, 2000, after the Court denied Mr. Garcia's motion to continue the trial date, the State made another offer.  This offer was identical to the terms in the first plea offer.  Throughout these plea negotiations, the parties discussed the possibility that the State would agree to cap the initial period of incarceration at 30 years.  [RP at 144.]  Mr. Garcia initially accepted this offer and then rejected it a few minutes later.  [Id.]

18.     The third plea offer occurred after Mr. Sanchez had interviewed Dolores on September 4, 2000, and Mr. Garcia had listened to the taped interview.  Mr. Garcia thought he might have had a few hours to a day to consider this offer.  During this period, Mr. Garcia was in frequent contact with Mr. Sanchez.  Mr. Garcia ultimately accepted this plea offer even though it exposed him to the possibility of 0 to 78 years of incarceration.  [RP at 144-45.]

### *Plea Proceedings:*

19.     On September 7, 2000, Judge Knowles filled in for Judge Allen and conducted the plea proceedings in this case.  The plea, however, was subject to Judge Allen's approval.  [Tr. of 9/7/00 plea hearing, at 3.]  During the plea allocution, Mr. Garcia confirmed under oath that he had signed the plea agreement, read it, understood it, discussed it with counsel and agreed with it.  [Id., at 4.]  Judge Knowles reviewed with Mr. Garcia that he was pleading guilty to 14 separate felony counts and that there was no agreement as to sentencing.  Mr. Garcia agreed that this was what he understood as well.  [Id.]  Judge Knowles further explained that the other counts in the indictment

7

to which Mr. Garcia was not pleading and/or that were not going to be incorporated in the information, would be dismissed as part of the plea.  Mr. Garcia understood this.  [Id. at 4-5.]  Judge Knowles stamped the criminal information as being filed in open court and then discussed with Mr. Garcia the waiver of preliminary hearing and presentation to grand jury regarding the information.  Mr. Garcia stated that he had signed the waiver and had discussed with his attorney his rights to have the case reviewed by a grand jury or by a judge for probable cause.  [Id. at 5.]  Mr. Garcia understood these rights and agreed to give them up of his own free will.  He was not forced to give up these rights.  [Id. at 5-6.]  Mr. Garcia had reviewed the information, waived a formal reading of the information and entered pleas of not guilty "temporarily on those."  Counsel for Mr. Garcia then stated that he understood the counts in the information were incorporated into the plea.

20.    Next, Judge Knowles reviewed the charges to which Mr. Garcia was pleading guilty.  The state court noted that the first degree felonies each carried a basic sentence of nine years.  The second degree felonies also each carried the same sentence of nine years.  The third degree felonies each carried a sentence of three years.  The Court explained that Mr. Garcia was facing anything from straight probation up to a total term of 78 years, and that there was no agreement as to sentencing.  Mr. Garcia testified that he understood this.  [Id. at 4, 8-9.]  Mr. Garcia proceeded to plead guilty and to give up his right to a jury trial.  He again understood these rights.  [Id. at 9.]  The Court expressly explained that in so doing, Mr. Garcia gave up his right to confront and cross-examine witnesses, to compel the attendance of witnesses on his behalf, and his presumption of innocence.  Mr. Garcia did not initially realize he was giving up his privilege against self-incrimination.  After the Court's explanation, however, he agreed he understood he was giving up this right and had no further questions about this right.  In reference to all of his rights, Judge Knowles asked Mr. Garcia:

Q:      This says that you wish to give those rights up, is this true?

A.      Yes.

Q.      Are you giving these rights up of your own free will?

A.      Yes

Q.      Is anyone forcing you to do this?

A.      No.

[Id. at 6.]  In response to Judge Knowles' questions, Mr. Garcia stated he had not been forced or threatened in any way to plead guilty and that no promises were made to him.  [Id. at 11.]  He had discussed the plea, his rights and his possible defenses at trial with his attorney and was satisfied with Mr. Sanchez's representation.  [Id. at 11-12.]  Mr. Garcia testified that he was not under any physical or mental disabilities that day that might affect his ability to understand the proceedings, nor was he under the influence of alcohol or drugs.  [Id. at 13.]

        21.     Judge Knowles discussed several ways to handle the factual basis for the plea.  Mr. Garcia agreed that he understood the charges of which he was accused.  [Id. at 13.]  When asked if he did "all of the things [he was] accused of in each of the counts" he responded that he was "pleading guilty."   The court asked him again if he did each of those things and all of the elements in them, and again while under oath, Mr. Garcia responded "yes."  [Id. at 14.]  Judge Knowles then asked if the parties were satisfied with the factual basis or whether they wanted more detail.  Both the State and counsel for Mr. Garcia stated they were satisfied.  Mr. Sanchez further noted that he had interviewed numerous witnesses and was satisfied there was a factual basis.  The court reiterated that it could go into more detail under each of the elements of the offenses, and Mr. Sanchez

9

responded "no."  [Id. at 14.]  At no time during the plea hearing did Mr. Garcia profess innocence

or deny that there was a factual basis to support his plea.

22.     On September 13, 2000, Mr. Garcia appeared with attorney Sanchez before Judge

Allen on the State's motion to review conditions of release.  [Tr. of 9/13/00 hearing.]  During the

brief hearing, neither Mr. Garcia nor his attorney raised any issues regarding his prior guilty plea

and/or a desire to withdraw the plea.  Mr. Garcia did not claim that he had been coerced to plead

guilty nor did he claim that his attorney nudged him with his elbow or forced him to plead.  Mr.

Garcia gave no indication to Judge Allen that the earlier plea was in any way coerced.

### *Attorney Alex Chisholm, Motion to Withdraw Plea, Sentencing:*

23.     On October 17, 2000, Attorney Chisholm substituted for Mr. Sanchez as Mr. Garcia's

attorney.  [RP at 71.]  Mr. Garcia filed an affidavit, signed October 6, 2000, stating that "after much

thought and reflection," he wished to withdraw his guilty plea of September 7, 2000.  [RP at 72.]

On October 17, the Court permitted Mr. Chisholm to enter his appearance and Mr. Sanchez to

withdraw as counsel.  [RP at 73.]

24.     On October 18, 2000, the State filed a Sentencing Memorandum, arguing that Mr.

Garcia should be sentenced to the full term of incarceration of 78 years.  [RP at 74.]

25.     On October 19, 2000, Mr. Garcia filed a motion to allow withdrawal of his plea,

arguing that he had not voluntarily, knowingly and intelligently entered into his plea agreement.

Instead, he claimed to have entered into it "impulsively, irrationally and emotionally."  The motion

also asserts that Attorney Sanchez failed to provide and prepare an expert witness in a timely fashion,

that this omission constituted ineffective assistance of counsel and that Sanchez's failure to obtain an

expert was a substantial factor in forcing Mr. Garcia to enter into the plea.  [RP at 78.]  The motion

further states that Mr. Garcia was overwhelmed after listening to his daughter's taped interview. Although Mr. Garcia consistently asserted he was innocent, in this motion his counsel argued that Mr. Garcia believed his daughter statements during the interview were convincing and that if he did not know she was speaking falsehoods, he would believe her.  Mr. Garcia stated he saw a "decided change" in Attorney Sanchez's demeanor towards him after Dolores' interview, concluding that Sanchez no longer believed him and was not his defender.  Mr. Garcia attested that he felt trapped between the "pervasive affect [sic] of the perceived truth" and the "tremendous pressure" Attorney Sanchez placed on Garcia to sign the plea.  Mr. Garcia stated that he and his attorney (Sanchez) forgot that Garcia did not want his attorney merely to protect him from the possible bad consequences at trial and instead wanted his attorney to defend him through trial "and the consequences be damned."  [RP at 80.]

26.      In the motion to withdraw plea, Mr. Garcia admitted that Sanchez did a "good job of negotiating a plea agreement" and that Garcia understood that the plea agreement, "if not withdrawn, may save him years and even decades of jail time . . . ."  However, Mr. Garcia asserted that he "cannot plea to something he did not do just to avoid jail time."  [RP at 80.]   At the hearing, Mr. Garcia testified: "I can't plead to something that I didn't do."  [Tr. of 10/27/00 Hearing, at 10-11.]

27.      Finally, the motion argues that Attorney Sanchez failed to provide and prepare an expert witness in a timely fashion, which was the foundation of an effective defense for Mr. Garcia where the State had a "compelling case against [him] with at least two expert witnesses."  "Without an expert witness, prepared to help [Garcia] tell his story to the jury, [he] was denied his best defense in this case."  [RP at 81; Tr. of 10/27/00 Hearing, at 11.]

28.     On October 27, 2000, Judge Allen held an evidentiary hearing on Mr. Garcia's motion. At the hearing, Mr. Chisholm called Mr. Garcia's sister, Felissa Garcia-Kelley, and Mr. Garcia himself. [Tr. of 10/27/00 hearing, at 2.] Ms. Garcia-Kelley testified that she knew her brother had attempted to reach and meet with Attorney Sanchez on numerous occasions but that he rarely succeeded. Ms. Garcia-Kelley attempted to reach Mr. Sanchez on behalf of her brother as well, but Mr. Sanchez never returned her calls.

29.     Mr. Garcia testified that when he retained Mr. Sanchez, he paid him a flat fee and that Mr. Sanchez told Garcia he would defend him against the charges, as well as hire a private investigator and some expert witnesses to give psychological evaluations. Mr. Sanchez did not do any of these things. [Tr. of 10/27/00 hearing, at 7.] While Mr. Sanchez did not contact any expert witnesses, Garcia himself engaged Dr. Moss Aubrey with respect to a CYFD proceeding. [Id. at 7, 31; Doc. No. 1, Ex. O, p. 5.] Mr. Garcia testified that he may have met in person with Sanchez no more than four times, always at Mr. Garcia's request, and that Garcia probably attempted to reach Sanchez by telephone on 25 to 30 occasions without any return calls from Sanchez. [Tr. of 10/27/00 hearing, at 9.] Mr. Garcia also stated that he had given Mr. Sanchez a list of about seven witnesses.

30.     Mr. Garcia testified that when he accepted the third plea agreement that was offered to him, he regretted it on that same day and began contacting other attorneys to represent him shortly after that date. [Id. at 12-13.] At the time he entered his plea, Mr. Garcia felt his spirit was broken after having heard the taped interview that his daughter gave. Mr. Garcia believed that Mr. Sanchez "convinced" him to accept the plea offer, that Mr. Garcia was under "tremendous pressure," and that he acted like a coward in not telling the "real truth of his innocence." [Id. at 14.]

31.     At the hearing and on cross-examination, Mr. Garcia testified that he had lied on a
number of occasions during the plea hearing, e.g., when he stated he was satisfied with Mr. Sanchez's
representation and that he understood the crimes with which he was charged.  Mr. Garcia asserted
that Mr. Sanchez was nodding his head at the judge's questions and telling Garcia to say yes.  [Id.
at 17.]  Mr. Garcia also testified that when he accepted the plea agreement, he knew from Attorney
Sanchez that the State was going to bring charges against him regarding sexual abuse of his younger
daughter (Senaida) as well, and he did not want to drag his family through all of this.  [Id. at 20.]  Mr.
Garcia testified that he felt "more maneuvered, more manipulated" by Attorney Sanchez to accept
the plea than he felt coerced.  [Id. at 21-22.]

32.     At the hearing, the State called Genie Mata from the Probation and Parole Office.  Mr.
Garcia met with Ms. Mata on October 4, 2000 after he had entered his guilty plea on September 7.
He told her that he had made a mistake and wished to proceed to trial.  [Id. at 33.]  After Ms. Mata's
testimony, the Court recessed on October 27 so as to locate Mr. Sanchez.  Mr. Sanchez did not
attend the October 27 hearing.  [Id. at 38.]

33.     The hearing was continued on October 30, 2000.  [Tr. of 10/30/00 hearing.]  The
State called Mr. Sanchez.  Attorney Sanchez believed that he had met with Mr. Garcia about a dozen
times between the time he was retained in February 1999 and the September 7, 2000 plea.  [Tr. of
10/30/00 hearing, at 3.]  Mr. Sanchez had discussed with Defendant the need for expert witnesses
and their possible use in a case such as Mr. Garcia's.  Mr. Sanchez stated that he had interviewed the
majority of the State's witnesses in this case.  [Id., at 6.]

34.     Mr. Sanchez noted that he had interviewed the State's psychologist witnesses about
a week before trial and that he told Mr. Garcia at that time that the defense needed someone to come

in and review the doctors' diagnosis of PTSD.  "[W]ithout any other external stressors on this child,

could lead a jury to say, Okay, this [the alleged abuse] is what caused it, okay.  So I thought we

needed somebody to come in and show this was not PTSD or that there was something else . . . ."

[Id. at 9.]

35.     Mr. Sanchez testified that Mr. Garcia had consistently maintained his innocence and

had told Mr. Sanchez he did not want to accept the first two plea offers.  Mr. Sanchez told Mr.

Garcia that it would be very difficult for Garcia at trial in view of testimony from the State's witnesses

and the victim.  [Id. at 10-11.]

36.     After interviewing Dolores[4] on September 4, 2000, Mr. Sanchez understood that the

State intended to seek another indictment against Mr. Garcia based on statements Dolores made

regarding additional allegations of sexual intercourse.  [Id. at 14.]  If convicted of the charges in this

proposed new indictment, Mr. Garcia would face significant additional exposure at sentencing.  The

grand jury was scheduled to convene on September 8, 2000, the day after Mr. Garcia entered into

his plea agreement.  [Id.]  During his discussions with Mr. Garcia about the last plea offer, Mr.

Sanchez testified that he told Mr. Garcia that it would be very difficult for a jury to come to anything

but a negative conclusion as to Garcia without a  defense expert.  [Id. at 15.]  Mr. Sanchez believed

that Mr. Garcia felt pressured regarding his plea decision primarily because of the candid information

Mr. Sanchez communicated to Mr. Garcia about his chances at trial.  [Id. at 17-18.]  Mr. Sanchez

---

[4]Once the defense interviews the alleged victim of a sex crime, the State has a policy that no plea offers
will be made.[Id. at 11-12.]  According to the State, Attorney Sanchez pushed the DA's Office to tender a third plea
offer even after the victim was interviewed.  The DA's Office agreed to do so, which the State characterized as
unusual.  [RP at 145.]

told Mr. Garcia that the plea offer was more favorable  than to proceed to trial and risk exposure to a 160 year sentence.  [Id. at 19.]

37.     Mr. Garcia had taken two polygraph tests with respect to the allegations of this case and had failed them, although such evidence would not necessarily be admissible at trial.  [Id. at 20-21.]

38.     Mr. Sanchez did not believe it would be helpful to pursue the option presented by Judge Allen of having a defense expert sit through the trial testimony and then testify.  [Id. at 22.]

39.     After considering the disputed evidence concerning the alleged coercion and claimed involuntariness of the plea, and after hearing argument by counsel, Judge Allen denied Mr. Garcia's motion to withdraw his plea.  The Court rejected Mr. Garcia's claims that his plea was not knowing, willing or voluntary and reasoned that the plea was voluntary and not the product of force or coercion.  [Id. at 54.]

40.     On the same day (10/30/00), the Court proceeded to Mr. Garcia's sentencing.  The State called several witnesses to testify, including Andrea Serrano Garcia, Sadie Serrano and Tina Garcia., all of whom testified about their perceptions of Dolores' veracity and Mr. Garcia's lack of veracity.  Tina Garcia[5] testified about alleged sexual abuse among Mr. Garcia's siblings when Mr. Garcia was young.

41.     Mr. Garcia's attorney called Mr. Garcia's son to testify during the sentencing proceeding.  Carlos Garcia testified that he believed his dad was innocent of the charges.  Ms. Garcia-

---

[5]Mr. Garcia's wife, Tina, initially defended her husband's innocence.  By the time he was sentenced, however, she had changed her position and testified strongly against him. [Id. at 59-70.]  It appears that the three other children would have given testimony in support of their father, at least at the time when Mr. Garcia entered his plea and was sentenced.  [Exs. I, J, K, M to habeas hearing.]

Kelley also testified regarding an older brother's incest and the fact that her brother, Mr. Garcia, protected her when she was a child.

42.     At the earlier plea hearing, Judge Knowles told Mr. Garcia: "You're facing anything from straight probation up to a total of 78 years in the Department of Corrections.  Do you understand that?"  Mr. Garcia answered "Yes."  [Tr. of 9/7/00 plea hearing, at 9.]  Judge Knowles also advised Mr. Garcia that there was no agreement as to sentencing, and Mr. Garcia understood that.  [Id. at 4.]  The state court sentenced Mr. Garcia to the maximum period of incarceration – 78 years, but suspended 28 years, with the result that Mr. Garcia would serve 50 years.

### *Appeal:*

43.     On November 27, 2000, Mr. Garcia filed his notice of appeal.  At that time, he was represented by present habeas counsel, John D. Cline.  [RP at 159.]  The issues raised on appeal were: (1) whether the trial court applied the wrong legal standard in denying the motion to withdraw guilty plea; (2) whether the trial court abused its discretion in denying the motion to withdraw guilty plea; (3) whether the trial court failed to advise Mr. Garcia of the nature of the charges as required by state law; (4) and  whether the trial court failed to establish a factual basis for the guilty plea as required by state law.  [RP at 178-79.]  The New Mexico Court of Appeals proposed summary affirmance on February 9, 2001.  [RP at 187.]  The appeal was assigned to the general calendar on March 30, 2001.  [RP at 195.]  On January 7, 2002, after full briefing, the New Mexico Court of Appeals affirmed Mr. Garcia's convictions, and specifically held that Mr. Garcia had failed to establish ineffective assistance of counsel.  [RP at 207, 225.]

44.     On May 24, 2002, Mr. Garcia filed a motion to reduce his sentence based in part on his "exceptional conduct" in prison thus far.  [RP at 226, 235.]  Judge Allen held a hearing on July 23, 2002 and denied the motion.  [RP at 245.]

### *State Habeas Petition:*

45.     On January 17, 2003, Mr. Garcia filed a state habeas petition.  [RP at 246.]  He asserted that his two attorneys – Sanchez and Chisholm – both rendered ineffective assistance of counsel.  [RP at 265.]  He claimed that Sanchez was ineffective in failing to retain mental health and medical experts.  Habeas counsel for Mr. Garcia retained mental health and medical experts who would testify on behalf of Mr. Garcia.  [RP at 267, 268.]  Sanchez also was ineffective in failing to interview one of the State's proposed mental health experts, Dr. Wilbur.  Sanchez failed to request that Dolores be given an independent psychological evaluation, and she never did receive an independent evaluation.  Sanchez failed to interview potentially helpful defense witnesses, did not adequately analyze inconsistencies in the victim's allegations, incorrectly conveyed to Mr. Garcia that there was a realistic possibility of receiving a probationary sentence, and failed to object at the plea colloquy as to the state court's failure to comply with state law.  [RP at 268-74.]  Mr. Garcia's allegations against Attorney Chisholm, *inter alia,* were that he did not seek a continuance of the hearing on Mr. Garcia's motion to withdraw his guilty plea in order to obtain experts, did not raise inconsistencies as to Dolores' allegations, "incorrectly" told the Court that the prosecution had a compelling case against Mr. Garcia, erroneously relied on a theory that was baseless, and failed to argue that Mr. Garcia's prior counsel was ineffective.  Mr. Garcia also asserted in his state habeas petition that his due process rights were violated by the failure to ensure that his plea was knowing, intelligent and voluntary.  [RP at 277.]

17

46.     On February 4, 2003, the state court denied Mr. Garcia's petition for writ of habeas corpus, relying primarily on the New Mexico Court of Appeals' decision affirming Mr. Garcia's convictions on appeal.  [RP at 292-95.]  The New Mexico Supreme Court remanded the case and ordered that the state court hold an evidentiary hearing on two issues:  whether Mr. Garcia received ineffective assistance of counsel on his motion to withdraw his guilty plea and whether his plea was knowing, voluntary, and intelligent.  [RP at 299, 508, 509.]  The parties agreed that the claims concerned allegations that both Sanchez and Chisholm provided ineffective assistance of counsel to Mr. Garcia.  [RP at 299-300.]  Prior to the hearing, additional briefing was submitted to the Court on Mr. Garcia's state habeas petition.  [RP at 299, 318.]  Also, Mr. Garcia filed a motion for an independent mental health evaluation of Dolores, which the Court denied.  [RP at 326, 413.]

47.     The state court conducted a two-day evidentiary hearing on Mr. Garcia's state habeas petition.  [Tr. of 1/22/04 and 1/23/04 hearing.]  This was the second evidentiary hearing conducted on the claims of coercion, involuntariness and ineffective assistance of counsel.  At the hearing, counsel for Mr. Garcia introduced a number of exhibits for the court's review, including Dolores' diary, treatment notes by doctors and psychologists, notes by psychologists regarding interviews of the other children in the Garcia family,  initial interview notes regarding Tina Garcia's (Dolores' mother) statements, psychological evaluation of Mr. Garcia, a psychophysiological assessment of Mr. Garcia done by Dr. Aubrey (penil plethysmograph) [Ex. Q to state habeas hearing],[6] a safehouse interview of Dolores, and an interview of Miguel Acosta.)

---

[6]The State described a plethysmograph as a test that examines a male's sexual arousal to different stimuli. [Doc. No. 1, Ex. O, p. 5.]

48. Defendant's first witness was Mr. Sanchez who testified that he had taken to trial one child sexual abuse case before representing Mr. Garcia. During his representation of Mr. Garcia, Sanchez neither consulted with nor retained a mental health expert. [Tr. of 1/22/04 hearing, at 12] Mr. Sanchez knew that Dr. Ornelas had examined Dolores and the physical findings of that exam were normal; however, Mr. Sanchez neither consulted with nor retained a medical expert to discuss the possible significance of Dr. Ornelas' findings. [Id. at 13.] Mr. Sanchez never filed a request to conduct an independent mental health evaluation of Dolores. [Id. at 14.] Mr. Sanchez testified hat he did not believe he could win at trial without a mental health expert.

49. Upon questioning by the prosecution, Mr. Sanchez testified that most of the witness names provided to him by Mr. Garcia were on the State's witness list and that he had spoken to them informally. [Id. at 20-21.] Mr. Sanchez found inconsistencies in the victim's stories but believed her to be a credible witness after his interview of her. Mr. Sanchez found Mr. Garcia to be literate and fairly well educated. [Id. at 42.] In Mr. Sanchez's opinion, Mr. Garcia understood that he could reject a plea offer and proceed to trial.

50. Mr. Sanchez understood that the indictment in this case exposed Mr. Garcia to something like 150-160 years in prison, the evidence against Mr. Garcia was formidable, and that the deal he ultimately pled to exposed Mr. Garcia to only 78 years in prison. [Id. at 54.] Under either scenario, since Mr. Garcia was in his mid-40's, the possible exposure was to life in prison. [Id. at 55.] Mr. Sanchez would have told Mr. Garcia that he had the potential of a 0 to 78 year sentence, zero meaning probation only. [Id. at 57.]

51. Mr. Sanchez testified that a significant factor in Mr. Garcia's decision to plead guilty was the fact that he did not have a defense mental health expert for trial. [Id. at 55.] However, Mr.

19

Sanchez also testified that there were many other factors Mr. Garcia considered, including "allegations of new indictments possibly regarding other individuals." [Id. at 58.] As part of the plea negotiation, Mr. Garcia would not be charged with other matters. [Id.] The possible new allegations concerned an incident where Dolores' aunt claimed to have walked in while Mr. Garcia was sexually molesting a child. He had his finger inside Dolores' younger sister Senaida's vagina when Senaida was a baby. [Id. at 59; Tr. of 1/23/04 hearing, at 12, 68.]

52.     Mr. Chisholm testified next. When Mr. Chisholm represented Mr. Garcia in 2000, he had been a practicing attorney for about two years and had never handled a criminal matter. [Tr. of 1/22/04 hearing, at 60-62.] Mr. Chisholm may have consulted with medical or psychological experts but did not retain any for the motion to withdraw guilty plea. Mr. Chisholm never moved to continue the hearing on his motion. He did, however, attempt to reach Mr. Sanchez constantly but was never able to reach him. [Id. at 63-64.]

53.     Mr. Chisholm attempted to associate with a more experienced criminal defense attorney with respect to this matter but was unable to convince any other attorneys to provide assistance. Mr. Chisholm advised Mr. Garcia that his odds in winning the motion were poor. Although he was unable to obtain any records from Mr. Sanchez regarding the case, Mr. Chisholm did obtain a file from the DA's office. Mr. Chisholm had approximately one month to get up to speed before the hearing was held. As of the date of this habeas hearing, Mr. Chisholm did not know or recall what the standard was in being permitted to withdraw a guilty plea before sentencing, but at the pertinent time, his research revealed that the legal standard was onerous.

54.     Mary Roy, a licensed clinical social worker, testified at the habeas hearing. Ms. Roy was one of the therapists who saw Dolores, beginning in October 1999. By then, two psychologists

had seen Dolores, including Dr. LaRisa Newell and Dr. Karen Wilbur.  [Id. at 76-77.]  Ms. Roy

diagnosed Dolores with PTSD.  According to Ms. Roy, this diagnosis was consistent with those by

the two previous psychologists.  Ms. Roy's diagnosis was not based on objective testing, but rather

on clinical face-to-face interviews.  Dolores never disclosed the details of the alleged abuse to Ms.

Roy, nor did Ms. Roy ask for the details.  Ms. Roy knew that Dolores was an excellent student but

had found that many victims of sexual abuse tended to over-excel in other areas.  Ms. Roy's last

session with Dolores was in late October 2000, after Mr. Garcia had pled guilty.  Ms. Roy is not

aware whether Dolores sought treatment from any other therapists after that date.

55.    In late 1999, Dr. Marlene Vernardos did some preliminary objective testing of

Dolores.[7]  She stated that because only a brief psychological evaluation was authorized, she

administered only one psychological test.  It was a true/false, self-reporting inventory which depended

on the individual's willingness to disclose appropriately.  According to Dr. Vernardos, Dolores was

"overly defensive and was consciously and unconsciously minimizing her psychological problems and

concerns."  As a result, the test results may not have been accurate.  Dr. Vernardos could not refute

the prior diagnosis of PTSD and noted the question of whether other diagnoses were also present

remained unclear because of the brevity of the evaluation and Dolores' overdefensiveness.  [RP at

349-350.]

56.    Dr. Stephen Guertin testified (for Mr. Garcia) at the state habeas hearing by telephone.

The Court recognized Dr. Guertin as a medical expert and in particular as an expert on the physical

effects of sexual abuse of children.  [Id. at 114.]  Dr. Guertin did not examine Dolores, but he did

---

[7]Claudia Johnson, a clinical social worker also evaluated Dolores in late 1999.  She found Dolores to be credible and "serious in her statement of events."  [RP at 352.]  Dolores' symptomology was consistent with a history of sexual abuse.  Ms. Johnson diagnosed Dolores with PTSD and Major Depression.

evaluate Dr. Ornelas' exam of Dolores and the corresponding medical records.  Dr. Guertin opined that if Dolores had suffered penile vaginal intercourse in a prepubertal stage of life, the exam performed by Ornelas would not have been normal and without evidence of injury.  [Id. at 118-20.] However, Dr. Guertin also admitted that children sometimes believe they have been penetrated by a penis when they have suffered interlabial or intercrural intercourse, neither of which involves an event where the penis transcends the plain of the hymen.  [Id. at 121.]  In other words, the lack of an objective finding of injury did not rule out sexual abuse.

57.     Dr. Renee Ornelas testified at the hearing for the State.  She is a UNM Pediatrician. [Id. at 131.]  She was qualified as an expert pediatric sexual assault examiner.  Dr. Ornelas examined Dolores when she was 15, after Dolores had first reported sexual abuse by her father that had been occurring since the time she was 4 or 6 years old.  Dr. Ornelas testified that the normal test result did not exclude many forms of sexual abuse, including fondling, touching a penis or genital area, being touched in the genital area, oral contact with genitals, sodomy, anal penetration, and/or labial or vulvar coitus.  If the child had suffered true vaginal penetration, that usually would result in tearing and a scar that could be seen up until puberty and sometimes after puberty.  [Id. at 141.]  After adolescence, those scars may be masked or may disappear as a result of normal changes to the body at that age.  [Id. at 142.]

58.     Dr. Susan Feister testified for Mr. Garcia at the hearing.  She is a forensic psychiatrist. [Tr. at 149.]  Dr. Feister did not meet with Dolores but reviewed many of the psychological interviews and records.  She testified that in order to reach a definitive diagnosis for Dolores, she would find objective testing to be critical.  Dr. Feister opined that the diagnoses of PTSD from the treating therapists were not reliable without objective testing.  [Id. at 161.]

22

59.     In 2003, Dr. Feister performed a psychiatric evaluation of Mr. Garcia while he was in prison.  [Id. at 172.]  Based on that evaluation, Dr. Feister opined that when Mr. Garcia entered into his plea three years earlier in September 2000, he was suffering from a severe major depressive disorder of the non-polar type.  [Id. at 173.]  She further opined that it was not really possible for Mr. Garcia to have knowingly, intelligently and voluntarily made a decision to accept the plea offer in 2000.  [Id. at 175.]

60.     The first prosecutor handling Mr. Garcia's case also testified during the second day of the state habeas hearing.  [Tr. of 1/23/04 hearing.]  He testified that Garcia's other children, including the one allegedly abused as a baby, were supportive of their father.  In addition, the DA testified that Mr. Sanchez had never provided a list of defense witnesses and knew only that Mr. Sanchez wanted to hire an expert.  [Id. at 74.]  The prosecutor was not aware that the defense used any investigators.  Moreover, after Mr. Sanchez received a favorable ruling from the state court regarding some questions he attempted to ask a CYFD caseworker, Mr. Sanchez did not pursue a second interview with the caseworker so that he could ask those questions.  [Id. at 76-77.]

61.     Mr. Garcia also testified at the habeas hearing.  He stated that had he known of the availability of expert testimony like that of Dr. Guertin and Dr. Feister, he would not have pled guilty.  [Id. at 82.]  Mr. Garcia testified that his attorney was telling him to plead guilty in September 2000, but that he was not forced to plead guilty.  [Id. at 108-110.]  Mr. Garcia also testified that based on discussions with Attorney Sanchez, Garcia "fully expected to receive probation . . . [because] it was, according to [Sanchez], a first offense, and there were no other offenses, and that was it.  That's what I expected, probation and a program."  [Id. at 116.]  Mr. Garcia testified that he had failed some lie

detector tests (related to the earlier CYFD proceeding) but that his failure to pass the tests had nothing to do with accepting the plea offer.  [Id. at 121.]

62.     On January 30, 2004, the state court entered its findings of fact and conclusions of law regarding Mr. Garcia's habeas petition and denied the petition for writ of habeas corpus.  [RP at 507.] The state court adopted the State's findings as to the "discovery done by Sanchez".  [RP at 504.] In it proposed findings, the State stated that Sanchez did not consult any mental health experts or a physician.  [RP at 486-87.]  Sanchez did not request an independent psychological examination of Dolores.  [RP at 487.]  Sanchez believed it would be difficult to win a trial without a mental health expert and he conveyed this view to Mr. Garcia.   Sanchez reviewed Dolores' statements and identified a "few" inconsistencies.  Sanchez discussed the factual allegations with Mr. Garcia.  He interviewed nine of the State's witnesses (but did not always complete each interview). He did not interview Miguel Acosta and Karen Wilbur.  Sanchez privately interviewed some of the family members identified by Mr. Garcia.  Sanchez met with Mr. Garcia approximately 12 times from February 1999 through early September 2000.  Sanchez moved the state court to continue the trial setting ten days before trial was scheduled.  [RP at 488-89.]

63.     The state court determined that after consideration of the discovery that Sanchez did and did not do, Mr .Garcia had not demonstrated that Mr. Sanchez's performance fell below the standard of a reasonably competent attorney.  [RP at 505.]

64.     The state court further decided that Mr. Garcia was fully aware of a number of factors that influenced his decision to plead guilty, including his understanding of the prior plea offers, that the State intended to present evidence to a grand jury of Mr. Garcia's additional crimes, the tape recorded interview of Dolores, the credibility of Dolores, that the indictment carried a possible

24

sentence of 168 years, that the victim was diagnosed with PTSD, which was supported by factual testimony of several witnesses, that Mr. Garcia had failed two polygraph tests and that the State had a strong case for conviction.  [RP at 506.]

65.     The state court also considered the fact that Mr. Garcia did not attempt to withdraw his plea between September 7 and October 9, 2000, even though he appeared before the court on September 13, 2000.  The state court also specifically concluded that Mr. Garcia failed to establish that but for the alleged errors by Sanchez, he would not have pled guilty, and instead, would have proceeded to trial.  [RP at 507.]

66.     The state court adopted the State's proposed findings as to Mr. Chisholm's representation of Mr. Garcia and concluded that his representation fell below the standard of a reasonably competent attorney in the motion to withdraw the plea.  However, the court decided that even so, Mr. Garcia did not demonstrate that he was prejudiced by the deficient performance.  [RP at 507.]

67.     On February 23, 2004, Mr. Garcia filed a petition for writ of certiorari, raising the same issues that are contained in both the state and federal habeas petitions.  [Doc. No. 1, Ex. H.] On March 22, 2004, the New Mexico Supreme Court denied the petition.  [Doc. No. 1, Ex. I.]

<u>Analysis</u>
<u>Deference to State Court Adjudications</u>

68.     Mr. Garcia's petition is analyzed under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  An application for writ of habeas corpus brought by an individual in custody pursuant to a judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted

25

in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceedings.  28 U.S.C. § 2254(d).

> A federal habeas court may issue the writ under the 'contrary to'
> clause if the state court applies a rule different from the governing law
> set forth in our cases, or if it decides a case differently than we have
> done on a set of materially indistinguishable facts.  The court may
> grant relief under the 'unreasonable application' clause if the state
> court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular case.
> The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and . . . an unreasonable application is different from an
> incorrect one.

Allen v. Mullin, 368 F.3d 1220, 1234 (10th Cir. 2004) (*citing* Bell v. Cone, 535 U.S. 685, 694

(2002)), *cert. denied*, 125 S.Ct. 1301 (2005).  This means that a federal court is precluded from

granting habeas relief, except in the narrow circumstances described in § 2254(d), and that this Court

must apply a presumption that the factual findings of the state court are correct unless the petitioner

can rebut this presumption by clear and convincing evidence.  Smallwood v. Gibson, 191 F.3d 1257,

1264-65 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000).

    69.    To justify federal habeas relief, the decision of the state court must not only have been

erroneous, but also unreasonable.  Williams v. Taylor, 529 U.S. 362, 365, 411 (2000); Gipson v.

Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004), *cert. filed*, Mar. 14, 2005.  "Federal habeas courts do

not sit to correct errors of fact or to relitigate state court trials.  Our jurisdiction is limited to ensuring

that individuals are not imprisoned in violation of the Constitution."  Thompson v. Oklahoma, 202

F.3d 283 (Table, Text in Westlaw), No. 98-7158, 2000 WL 14404 at *6 (10th Cir. Jan. 10, 2000),

*cert. denied,* 530 U.S. 1265 (2000).

70.     As an initial matter, the Court determines whether Mr. Garcia meets the exhaustion

requirements of 28 U.S.C. § 2254(b).  Respondent concedes exhaustion, and the Court agrees that

Mr. Garcia has exhausted his claims.  Moreover, Mr. Garcia's claims were adjudicated on the merits

by the state courts.

<u>**Ineffective Assistance of Counsel**</u> – <u>**Attorney Sanchez**</u>

71.     The United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668,

687, 104 S.Ct. 2052 (1984) governs the inquiry of whether an attorney's performance was ineffective.

In order to establish a claim of ineffective assistance of counsel, Mr. Garcia must show both that

"counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment," and that he was prejudiced because counsel's errors rendered the

outcome of the state court's proceedings unreliable.  In applying the test of whether an attorney's

performance was deficient and fell below an objective standard of reasonableness, the Tenth Circuit

advises that "we give considerable deference to an attorney's strategic decisions and 'recognize that

counsel is strongly presumed to have rendered adequate assistance and made all significant decisions

in the exercise of reasonable professional judgment.'"  <u>Bullock v. Carver</u>, 297 F.3d 1036, 1044 (10th

Cir.) (internal citation omitted), *cert. denied*, 537 U.S. 1093 (2002).

72.     One year after <u>Strickland</u>, the Supreme Court considered an ineffective assistance of

counsel claim in the context of examining whether a guilty plea was tainted due to counsel's

performance.  In <u>Hill v. Lockhart</u>, 474 U.S. 52, 106 S.Ct. 366 (1985), "[t]he Court held that a prisoner

challenging a guilty plea because of ineffective assistance of counsel satisfies the prejudice inquiry by

showing that the constitutionally ineffective performance 'affected the outcome of *the plea process.*
In other words . . . that there is a reasonable probability that, but for counsel's errors, *he would not
have pleaded guilty* and would have insisted on going to trial.'" Miller v. Champion, 262 F.3d 1066,
1072 (10th Cir. 2001) (emphasis added by Court in Miller), *cert. denied*, 534 U.S. 1140 (2002).

73.     Thus, "[a] defendant who challenges a guilty plea based on ineffective assistance of
counsel must demonstrate (1) deficient performance by counsel that (2) caused prejudice to the
defendant, United States v. Gordon, 4 F.3d 1567, 1570 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184
(1994), such that 'but for counsel's errors, [defendant] would not have pleaded guilty and would have
insisted on going to trial[.]'"  In applying this standard, Court sometimes will look to the strength of
the government's case "as the best evidence of whether a defendant in fact would have changed his plea
and insisted on going to trial." Miller, 262 F.3d at 1072.

74.     In Miller, the Tenth Circuit further elaborated that a prisoner's "'mere allegation' that
he would have insisted on trial but for his counsel's errors, *although necessary*, is ultimately insufficient
to entitle him to relief." Id. (emphasis added).  The prisoner need not, however, prove that there was
a reasonable probability he would have prevailed at trial. Id. at 1074.  "Of course, the 'assessment [of
whether the defendant would have insisted on changing his plea] will depend in large part on a
prediction whether the evidence likely would have changed the outcome of the trial,' . . . but the
ultimate issue that the court has to determine is whether the defendant would have changed his plea."
Id. at 1074-75 (*citing* Hill, 474 U.S. at 59).

75.     The Tenth Circuit has found a state court guilty plea to be constitutional "if the
circumstances demonstrate that the defendant understood the nature and the consequences of the

charges against him and that the defendant voluntarily chose to plead guilty." Miles v. Dorsey, 61 F.3d 1459, 1466 (10th Cir. 1995) (internal citation omitted), *cert. denied*, 516 U.S. 1062 (1996).

76.   Here, Mr. Garcia argues that Mr. Sanchez' performance fell below an objective standard of reasonableness for the following reasons: (1) failure to retain or consult mental health expert; (2) failure to retain or consult a medical expert; (3) failure to interview one of the state's several mental health experts (Dr. Wilbur) and other witnesses; (4) inadequate interview of Dr. Ornelas; (5) failure to request independent psychological evaluation of Dolores; (6) failure to explain to Mr. Garcia the importance and potential use of inconsistencies in Dolores' statements; (7) failure to meet more frequently with Mr. Garcia; (8) failure to properly and adequately inform Garcia of his chances of receiving a sentence of probation; and (9) failure to object at the plea hearing that Garcia was not adequately advised of the nature of the charges.  [Doc. No. 1, pp. 21-26.]

77.   The Court has carefully considered each and every allegation made by Mr. Garcia and concludes that Mr. Garcia has not demonstrated that Attorney Sanchez made such serious errors as to fail to function as "counsel" in violation of Mr. Garcia's Sixth Amendment rights.

78.   In particular, the Court reviewed the testimony of Mr. Garcia's psychological and medical experts presented during the state habeas hearing and did not find such testimony to be compelling evidence in Mr. Garcia's favor, or of the nature that "likely would have changed the outcome of the trial," should Mr. Garcia have gone to trial.  Indeed, Dr. Feister's testimony, three years after the fact, about Mr. Garcia's depression at the time of his guilty plea is unconvincing, if not irrelevant at that point.  Nor is the Court troubled by the lack of an expert to challenged three treating therapists' diagnoses that Dolores suffered from PTSD.  This is especially true when, according to the therapists' testimony, PTSD is frequently diagnosed by the symptoms exhibited by the patient.  The fact

that Mr. Garcia could have found some experts who would have disagreed with the State's experts and/or treating therapists does not convince the Court that Mr. Sanchez provided constitutionally deficient representation by failing to consult or retain a psychological expert. Even if a defense expert had testified that Dolores' diagnosis of PTSD was unconfirmed by objective testing and/or that other reasons could have accounted for Dolores' symptoms,[8] such evidence would not have significantly undermined the State's case.

79.    Mr. Sanchez's failure to consult or retain a medical expert also does present a showing of constitutionally defective representation. Dr. Guertin testified that had Dolores actually been raped, in the sense that she suffered penile vaginal intercourse, her physical exam most likely would not have been "normal," as Dr. Ornelas had found. Yet, Dr. Guertin also admitted that children sometimes believe they have been penetrated by a penis when they have suffered different types of intercourse, thus accounting for the possibility that a child might say she had been "raped" when a perpetrator's penis did not transcend the hymen. Thus, the Court does not find that such expert testimony would have been critical under the circumstances of this case, where a 15 year-old is reporting improper sexual contact that she encountered as early as the ages of 4 or 6.

80.    Moreover, Mr. Sanchez reviewed the medical records himself and interviewed most of the State's proposed experts and/or psychologists. He was well aware of the testimony they intended to present, and he concluded that such testimony on behalf of the State was convincing – a view he conveyed to Mr. Garcia.

---

[8]Even though Mr. Garcia explored other possibilities or motives for Dolores' accusations, none of them were compelling, e.g., problems because of Mr. Garcia's expectations for his daughter, where she needed to be at certain times and restrictions of Dolores' use of a car.  [Tr. of 1/22/04 hearing, at 22-23.]

81.    It is true that Mr. Sanchez did not interview all of the State's proposed witnesses, but he interviewed the majority of them.  In addition, while Mr. Garcia's attorney now criticizes the interview Mr. Sanchez conducted of Dr. Ornelas, he does so with the benefit of hindsight.  The question under Strickland is not whether counsel could have done more or even better, but whether counsel's actions or decisions were "[objectively unreasonable] in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.  To indulge in the "distorting effects of hindsight" would be contrary to exactly what Strickland attempts to eliminate.  Id. at 689.  The Court does not find that Mr. Sanchez's failure to interview several witnesses or his particular approach to one interview were "objectively unreasonable."

82.    The Court also finds unconvincing Mr. Garcia's argument that counsel was defective in not requesting an independent psychological evaluation of Dolores.  The State would have vigorously opposed the request.  [RP at 321, 322, 337-41.]  The Court agrees with the State that it was unlikely that such a request would have been granted under the circumstances of this case, and therefore, the lack of a request does not amount to a showing of objectively unreasonable representation.  Similarly, Mr. Sanchez's failure to emphasize and explain to Mr. Garcia the possible use "some things that were inconsistent" [Tr. of 1/22/04 hearing, at 16] in Dolores' statements do not amount to constitutionally deficient performance of counsel.  This is especially true here where both Mr. Sanchez and Mr. Garcia himself found Dolores' taped interview to be convincing, if not compelling.  Moreover, had the case gone to trial, Mr. Sanchez might very well have made some careful and appropriate tactical choices in how vigorously he pursued the inconsistencies of a 17 year-old witness who was recalling alleged instances of sexual abuse beginning at the age of 4 to 6.

83.     It is true that Mr. Sanchez was not particularly diligent in meeting frequently with his client, nor in returning his many telephone calls.  He also apparently did not return the calls of Mr. Garcia's attorney-sister or Mr. Garcia's subsequent counsel.  For reasons that are unexplained in the underlying record, Mr. Sanchez did not appear during the first day of the hearing on Mr. Garcia's motion to withdraw his guilty plea.  Also for reasons that are not explained in the record, Mr. Sanchez neither showed up for nor canceled in advance scheduled witness interviews.  Even after a favorable court ruling, Mr. Sanchez did not complete the witness interview at issue   While the Court acknowledges that Mr. Garcia may not have received the best or perfect legal representation at every step of the proceeding, a defendant is not entitled to perfect or error-free representation.  <u>Washington v. Watkins</u>, 655 F.2d 1346, 1357 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982);  <u>United States v. Rhoads</u>, 617 F.2d 1313, 1319 (8th Cir. 1980).  Thus, while other attorneys might have given Mr. Garcia better legal representation, the failures here do not constitute constitutionally defective representation.

84.     The Court also rejects Mr. Garcia's argument that his counsel was deficient in failing to advise him more fully of his chances of receiving probation.  Mr. Sanchez advised Mr. Garcia that under the third plea agreement he faced a possible sentence of 0 to 78 years of incarceration.  He also told Garcia that first degree felonies carried a mandatory jail time with them; however, he also conceded that there was a possibility that Mr. Garcia could get probation and that he "probably would have told" Garcia of that possibility.  [Tr. of 1/22/04 hearing, at 33, 56-57.]  The state court advised Mr. Garcia at the plea hearing that he was facing "anything from straight probation up to a total term of 78 years . . . ."  [Tr. 9/7/00 of hearing, at 9.]  Nothing in the record (except Mr. Garcia's self serving testimony) indicates that Mr. Sanchez emphasized that it was realistic for Mr. Garcia to expect a sentence of

32

probation only.  Moreover, it was not realistic to think that a plea to fourteen charges of sexual crimes against a child, which are crimes of violence, would result in a sentence of probation without incarceration.  In addition, the court explained to Mr. Garcia that no agreement had been made as to sentencing and more specifically that the plea agreement stated there were no "agreements as to probation."  Judge Knowles asked Mr. Garcia if that was his understanding of the plea agreement, and he responded "Yes."  [Id. at 4.]  The state court also explained that six of the counts to which Garcia plead each carried a basic sentence of nine years.  The eight third degree felony counts each carried a basic sentence of three years.  Finally, Mr. Garcia, under oath, told Judge Knowles that no one had many any promises to him other than those set out in the plea agreement.  [Id. at 11.]

85.     Even if Mr. Sanchez had predicted the possible sentence Mr. Garcia would receive, such predictions do not show that the plea was involuntary through ineffective assistance of counsel.  In United States v. Kerns, the Tenth Circuit noted the following:

> . . . some courts have suggested that a guilty plea may be deemed involuntary when defense counsel represents that 'by prearrangement with the prosecutor or the court, a plea of guilty will not result in greater than a given punishment, when, in fact, a greater punishment is imposed' such a representation is far different from a mere prediction by counsel as to the length of sentence which is likely to result from a guilty plea.

53 Fed. Appx. 863, 866, 2002 WL 31820953 at *2 (10th Cir. Dec. 17, 2002) (internal citation omitted).  Here, Mr. Garcia has not shown nor alleged that his attorney represented he had a prearrangement as to sentencing with the prosecutor or the court.

86.     Mr. Garcia's last argument, regarding his attorney's failure to object at the plea hearing regarding the factual basis of his plea, meets a similar fate.  The state court carefully explained that it could handle the factual basis for the plea in several ways.  The court first asked whether everyone

33

agreed that there was a factual basis with respect to each of the counts.  Mr. Garcia responded that he

understood what he was accused of.  [Tr. of 9/7/00 hearing, at 13-14.]  The court next asked:

> "Did you do all of the things you were accused of in each of the counts you are telling
> me that you wish to plead guilty to?
>
> Garcia:  I am pleading guilty.
>
> Court:  Did you do each of those things and all the elements in them?
>
> Garcia:  Yes.
>
> Court:  Are you satisfied with your factual basis, or do you want me to go into more details?
>
> . . .
>
> Sanchez:  Your Honor, I have reviewed and interviewed numerous witness, and I'm
> satisfied there's a factual basis.
>
> Court:  Mr. Garcia is admitting he has committed each of the acts as required under
> each of the elements for each of the offenses.  I can go in more detail than that if you
> wish?
>
> Sanchez: No, Your honor.

[Id. at 13-14.]  It is true that the state court gave Mr. Sanchez every opportunity to object or to request

a complete recitation of the factual basis for each count and that Sanchez did not object.  It is equally

true that Mr. Garcia testified under oath that he understood the factual basis to which he was pleading

and that he "did" each of the acts to which he was pleading guilty.  The Court recognizes that "a plea

of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused

committed the offense unless the accused has received real notice of the true nature of the charge[s]

against him . . . ."  Marshall v. Lonberger, 459 U.S. 422, 436 (1983).  The state court could have

engaged in a more exhaustive plea colloquy to ensure that Mr. Garcia understood each element of the

counts of which he was charged.  Here, however, the Court is satisfied from the record as a whole that

34

Mr. Garcia obtained a sufficient understanding of the underlying charges and their factual basis, thereby supporting a finding that Mr. Garcia's guilty plea was made voluntarily, knowingly and intelligently. This particularly true here where Mr. Garcia has some college education and professional work experience, and also where he considered and rejected two previous plea offers.

87.     In sum, the Court does not find that any of the allegations of constitutionally defective assistance of counsel by Mr. Sanchez, taken alone or together, satisfy Mr. Garcia's burden of satisfying the first prong of the <u>Strickland</u> inquiry.  The Court need not proceed to the second inquiry regarding whether Mr. Garcia was prejudiced by any errors committed by Mr. Sanchez.  However, the Court concludes that even if Mr. Garcia could satisfy the first inquiry, he fails to demonstrate prejudice.

88.     As stated above at ¶¶ 19-21, Mr. Garcia was thoroughly examined by Judge Knowles during the plea colloquy.  Mr. Garcia knew that he had a right to a trial, that he could confront his accusers and that at a trial, the State was required to prove its allegations by competent, admissible evidence beyond a reasonable doubt.  Mr. Garcia was asked if his plea was voluntary, and he was asked if he had been threatened, forced or coerced into taking the plea.  He denied that his plea was coerced in any way and further stated that "no promises" were made to him, other than those set forth in the plea agreement.   In addition, Mr. Garcia stated that he was not under the influence of any substances that affected his ability to understand the plea hearing that day.  In subsequent proceedings, Mr. Garcia conceded that Mr. Sanchez had not really coerced his guilty plea, even though Mr. Garcia felt pressured.  "It is well-established that a defendant's statements on the record 'as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.'"  <u>Romero v. Tansy</u>, 46 F.3d 1024, 1033 (10th Cir.) (internal citation omitted), *cert. denied,* 515 U.S. 1148 (1995).  *See also* <u>Lasiter v. Thomas</u>, 89 F.3d 699, 702 (10th Cir.) ("Solemn

declarations in open court carry a strong presumption of verity"), *cert. denied*, 519 U.S. 998 (1996). The Court concludes that Mr. Garcia has not overcome this formidable barrier.

89.     Mr. Garcia further testified that he was pleased with his attorney's efforts.  Indeed, his attorney negotiated three possible plea offers from the State, and was also successful in obtaining a plea offer after Dolores was interviewed by defense counsel, notwithstanding the State's policy in not making such offers after a victim is interviewed.

89.     The plea agreement provided Mr. Garcia a significant benefit.  It reduced his sentence exposure by half.  While Mr. Garcia received a sentence of 50 years, it is possible that he will be released before the end of that sentence through the accumulation of good time.  If he had proceeded to trial and been convicted of each count as charged, he could have been sentenced to a period of confinement that would not have permitted any release during his life time.  Mr. Garcia himself recognized that his attorney had done a good job negotiating the plea for him and that it may have saved him "decades" of prison time.

90.     Mr. Garcia also knew that the plea agreement eliminated the possibility of new charges being filed both by Dolores, as well as new charges filed on behalf of his youngest daughter.  He recognized that Dolores' testimony was credible and persuasive.  Dolores' testimony clearly was part of the reason Mr. Garcia decided to take the plea offer.  The testimony of Dolores' aunt, if admitted, would have been devastating for Mr. Garcia.  Defendant also knew that the plea agreement reduced the emotional burden on his family, i.e., subjecting them to supporting one family member over another.

91.     Mr. Garcia later may have changed his mind and regretted his previous decision to plead guilty.  However, "[o]ur role is not to undo what in hindsight may seem to [the defendant] to have been an unwise choice to plead guilty . . . .  Our role, instead, is to assure that the proceedings leading to his

36

conviction and sentence were free of constitutional error." <u>Allen</u>, 368 F.3d at 1244-45.  The Court

finds no constitutional error here.  While Mr. Garcia now testifies that he definitely would have

proceeded to trial had Attorney Sanchez arranged for expert testimony like that of Drs. Guertin and

Feister, his say-so alone is not convincing under the circumstances of this case.  The Court is not

persuaded that such evidence would have changed the outcome of a trial had one been held or that Mr.

Garcia would not have pled guilty and proceeded to trial where the State's case was not only strong,

but compelling.  The Court concludes that Mr. Garcia entered into his plea voluntarily, knowingly, and

intelligently and that he received effective assistance of counsel under the <u>Strickland</u> test from Attorney

Sanchez.

92.      The Court neither finds that the state court, in denying these same claims, reached a

decision that was contrary to, or involved an unreasonable application of established federal law, or that

its decision was based on an unreasonable determination of the facts in light of the evidence presented

by Mr. Garcia.  Thus, the Court recommends denial of the ineffective assistance of counsel claim as to

Mr. Sanchez's performance.

<b><u>Ineffective Assistance of Counsel</u> – <u>Attorney Chisholm</u></b>

93.      Mr. Garcia also challenges Attorney Chisholm's performance with respect to the motion

to withdraw plea.   Specifically, Mr. Garcia contends that Mr. Chisholm's performance was

constitutionally defective in that he failed to seek a continuance of the hearing on Garcia's motion to

withdraw plea, did not retain experts, did not seek an independent mental health examination of

Dolores, did not bring to the Court's attention the inconsistencies in Dolores' statements and

incorrectly informed the state court that the prosecution had a compelling case against Mr. Garcia with

two expert witnesses.  [Doc. No. 1, p. 29.]  Mr. Garcia also asserts that Mr. Chisholm erroneously

37

relied on a baseless theory during the hearing on the motion to withdraw plea and inexplicably failed to argue that the state court had not adequately advised Garcia of the factual basis for the plea.  [Id.]

94.    The state court considered these arguments and concluded that Mr. Chisholm's performance had fallen below the objective standard of reasonableness but that Mr. Garcia had not suffered prejudice because none of Mr. Chisholm's failures would have changed the court's ruling to deny the motion to withdraw plea.  Mr. Garcia argues that the state habeas court's ruling on the "prejudice" prong was an unreasonable application of clearly established law and that there was at least a reasonable probability that the New Mexico Court of Appeals or Supreme Court would have found that a "fair and just reason" existed for Mr. Garcia to withdraw his plea.  [Doc. No. 1, p. 30.]

95.    After considering evidence at the motion to withdraw plea hearing, the state court denied the motion, concluding that Mr. Garcia had not met his burden of setting aside the plea. Moreover, the state court found that the plea was voluntary and no one forced Mr. Garcia to accept the plea.  [Tr. of 10/30/00 hearing, at 53-54.]   The New Mexico Court of Appeals examined this issue on direct appeal and determined that the district court did not abuse its discretion in denying Mr. Garcia's motion to withdraw his guilty plea.  [RP at 225.]

96.    Mr. Garcia's state habeas petition raised a claim of ineffective assistance of counsel with respect to Mr. Chisholm's performance.  Judge Allen denied the petition, finding that none of Mr. Chisholm's alleged failures would have changed the court's ruling.  [RP at 294.]  The New Mexico Supreme Court remanded, and the district court held a two-day evidentiary hearing.  The district court concluded that Mr. Chisholm's representation was constitutionally deficient, but again held that even if Mr. Chisholm had properly represented Garcia, the court's denial of the motion to withdraw the guilty plea would have been the same.  [RP at 506.]

97.     This Court will defer to the state court's finding that Mr. Chisholm's representation of Mr. Garcia was deficient as to the first prong of <u>Strickland</u>.[9]  The Court also concludes that deference to the state court is appropriate as to the prejudice prong.  In other words, this Court finds that even if Mr. Chisholm had moved for a continuance of the hearing, retained experts, requested an independent psychological examination of Dolores, emphasized inconsistencies in Dolores' statements, raised the factual basis argument, omitted representations that the State had a compelling case and eliminated the use of a baseless argument at the hearing, he has not demonstrated "a reasonable probability" that but for these unprofessional errors, the state court's ruling would have been different.  *See* <u>Strickland</u>, at 694.  This is especially clear given the fact that the state habeas court heard testimony from the defense experts, was informed of the alleged inconsistencies in Dolores' statements (since her statements were exhibits to the hearing, including her tape recorded interview), rejected a request for an independent psychological exam of Dolores, heard testimony from which the court could have found the State had a compelling case against Mr. Garcia, and had heard ample argument as to whether Mr. Garcia understood the factual basis of his plea.  *See also* discussion *supra* at ¶¶ 78, 79, 87, 88-92.

98.     The Court neither finds that the state court, in denying these same claims, reached a decision that was contrary to, or involved an unreasonable application of established federal law, or that its decision was based on an unreasonable determination of the facts in light of the evidence presented by Mr. Garcia.  Thus, the Court recommends denial of the ineffective assistance of counsel claim as to Mr. Chisholm's performance.

---

[9]It is not clear from the hearing transcript or the court's decision what failures the court found to be constitutionally deficient on the part of Mr. Chisholm.  The court simply held that his performance as counsel was constitutionally defective.

**<u>Recommended Disposition</u>**

That Mr. Garcia's § 2254 petition [Doc. No. 1] be DENIED and that this matter be DISMISSED, with prejudice.

*Lorenzo F. Garcia*

Lorenzo F. Garcia
Chief United States Magistrate Judge